UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
PETROTERMINAL DE PANAMA, S.A.,

    Plaintiff,

      -v-

HOUSTON CASUALTY COMPANY, NATIONAL
LIABILITY & FIRE INSURANCE COMPANY
a/k/a NATIONAL FIRE & LIABILITY
INSURANCE COMPANY, LIBERTY MUTUAL
INSURANCE COMPANY, GREAT AMERICAN
INSURANCE COMPANY OF NEW YORK,
INDEMNITY INSURANCE COMPANY OF NORTH
AMERICA, CONTINENTAL INSURANCE
COMPANY, FIREMAN'S FUND INSURANCE
COMPANY and AMERICAN HOME ASSURANCE
COMPANY,

    Defendants.
------------------------------------x

14-cv-9554 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Plaintiff Petroterminal de Panama, S.A. ("PTP") brings this action for breach of contract and declaratory judgment against its insurers: (1) Fireman's Fund Insurance Company, Great American Insurance Company of New York, American Home Assurance Company, and Indemnity Insurance Company of North America (the "Primary Insurers"), and (2) Houston Casualty Company, National Liability & Fire Insurance Company a/k/a National Fire & Liability Insurance Company, Liberty Mutual Insurance Company, Great American Insurance Company of New York, Indemnity Insurance Company of North America, and Continental Insurance Company (the "Bumbershoot Insurers"). Collectively, the

1

defendants are simply referred to as the "Insurers." PTP seeks to recover, pursuant to two marine liability insurance policies issued by the Insurers, over $2 million in costs and fees that it incurred in the defense of an underlying lawsuit in New York Supreme Court. Currently before the Court are the parties' cross-motions for summary judgment.

The underlying facts are not in dispute. PTP is a Panamanian state-owned company that owns and operates oil storage and transfer facilities in Panama, including marine terminals on Panama's Atlantic and Pacific coasts connected by a trans-isthmus pipeline. See Affidavit of Jay M. Lonero dated February 27, 2015 ("Lonero Aff.") Ex. F ¶ 1. In 2003, PTP entered a Transportation and Storage Agreement (the "TSA") with Taurus Petroleum Limited ("Taurus") whereby Taurus leased PTP's facilities for storage of its crude oil and related shipping operations. Id. ¶ 4. In December 2005, Taurus assigned the TSA to Castor Petroleum ("Castor"), a global company based in Geneva, Switzerland. Id. ¶¶ 13-14. At that time, Castor did not register to do business in Panama. Id. ¶ 15.

On or about February 4, 2007, a valve ruptured at PTP's facility located at Chiriqui Grande (the "Atlantic Facility"), leading to a minor oil spill (the "Oil Spill"). Id. ¶ 23. Following the Oil Spill, PTP faced a series of lawsuits in Panamanian court seeking damages for personal injury and

2

property damage (the "Civil Actions"). See Declaration of Steven V. Rible dated February 27, 2015 ("Rible Decl.") Ex. N at 2. One of the Civil Actions was a lawsuit filed in the Maritime Tribunal of Panama, captioned Communidades de Cayo de Agua, et al. v. Unicom Management Service, et al. (the "Cayo de Agua Action"), which named both PTP and Castor as defendants. See Bumbershoot Insurers' Corrected Local Civil Rule 56.1 Statement dated March 20, 2015 ("Bumbershoot 56.1") ¶ 11.

In order to secure jurisdiction over Castor, the Cayo de Agua plaintiffs obtained an Order from the Panamanian court dated June 8, 2007, which attached the oil that Castor had stored at PTP's Atlantic Facility (the "Attachment"). Id. ¶ 12. The Attachment remained in place until it was suspended on July 16, 2007 by a Justice of the Panamanian Supreme Court. See Primary Insurers' Local Civil Rule 56.1 Statement dated February 27, 2015 ("Primary 56.1") ¶¶ 52, 59. Thus, for approximately six weeks, Castor did not have access to the oil it had stored at the Atlantic Facility. The full Supreme Court of Panama later found that the Attachment violated due process and should not have issued. Id. ¶ 60.

The TSA between Castor and PTP contained two indemnity provisions. Pursuant to the "Inland Indemnity" provision, PTP agreed to indemnify Castor for "any and all Damages … resulting from or relating to the operation of the PTP System, regardless

3

of the cause." Lenaro Aff. Ex. H ¶ 18. Pursuant to the "General Indemnification" provision, each party agreed to indemnify the other for damages "resulting from or relating to (i) the willful or negligent acts or omissions of the indemnifying Party or (ii) any breach or default by the indemnifying Party of any of its obligations, representations, warranties or covenants set forth in this Agreement or applying under Applicable Laws." Id. ¶ 19.

Castor filed suit against PTP in the Supreme Court of New York in Manhattan (the "Castor Action"). See Lenaro Aff. Ex. H. In its Complaint, Castor alleged that PTP was negligent in failing to prevent and properly respond to the Oil Spill, and that the Oil Spill in turn proximately caused the litigation that gave rise to the Attachment. Id. ¶¶ 23-34. Castor further alleged that, because of the Attachment, it lost access to its oil stored at the Atlantic Facility and therefore incurred business interruption damages for shipping-related expenses, trading losses, lost profits, lost opportunities, increased transaction costs, and decreased gross margins. Id. ¶¶ 36-47.

Castor sought $45 million in damages from PTP on each of four counts: (I) indemnification under the Inland Indemnity provision for damages resulting from the operation of PTP's system; (II) indemnification under the General Indemnification provision for damages caused by PTP's negligent maintenance of its facilities, in particular the ruptured valve, and by PTP's

4

negligent failure to contain the spill; (III) indemnification under the General Indemnification provision for breach of the TSA's covenants relating to facility maintenance and availability of the oil stored at the facility; and (IV) breach of contract based on the same covenants in the TSA. Id. ¶¶ 48-79.

PTP then sought indemnification and defense costs from the Insurers for both the Civil Suits and the Castor Action based on two marine liability insurance policies that they had issued. The first-layer policy is marine liability insurance policy number 06/662 issued by the Primary Insurers, having a per-occurrence limit of $1 million (the "Primary Policy"). See Rible Decl. Ex. A, at 1. The second policy is marine excess liability policy number 06/663 issued by the Bumbershoot Insurers, which provided excess coverage up to $45 million per occurrence (the "Bumbershoot Policy"). See Lonero Aff. Ex. A. Collectively, these policies are referred to as the "Insurance Policies."

The Insurers disputed coverage, and, on January 22, 2008, PTP filed suit in this Court against the Bumbershoot Insurers seeking a declaration that they owed PTP coverage for potential liabilities arising from the Oil Spill, including the claims asserted in the Civil Suits and the Castor Action. Bumbershoot 56.1 ¶ 30; see also Petroterminal De Panama S.A. v. Houston

5

Casualty Company, No. 08-cv-547 (S.D.N.Y. filed Jan. 22, 2008) ("Petroterminal I").

On April 28, 2008, PTP and the Bumbershoot Insurers entered, and the Court approved, an Agreement and Order pursuant to which the Bumbershoot Insurers agreed to indemnify PTP for certain liabilities it may incur in the Civil Suits. Rible Decl. Ex. N (the "Indemnity Agreement"). The parties then agreed to dismiss certain claims without prejudice. See Petroterminal I, No. 08-cv-547, ECF No. 15. The remainder of the case was subsequently resolved pursuant to an additional settlement agreement. See id., ECF No. 25.

Also on April 28, 2008, PTP, the Bumbershoot Insurers, and the Primary Insurers entered a separate agreement regarding the cost of defending the Civil Suits and the Castor Action (the "Defense Costs Agreement"). See Rible Decl. Ex. N. With respect to the Civil Suits, the Insurers agreed to reimburse the defense costs that PTP had already incurred and to pay 100% of defense costs going forward, subject to certain reservations and conditions. Id. With respect to the Castor Action, the Insurers agreed to pay for 50% of PTP's defense costs, past and future, subject to the proviso that:

> All parties hereto agree that they reserve all rights and defenses to seek a determination of coverage rights and obligations in respect of the Castor Suit, after that suit is concluded, under the Primary and/or Bumbershoot Policy(ies), and all parties further agree

6

> that the prevailing party(s) in respect of such coverage determination will be reimbursed by the adverse party(s) for the portion of the Castor Suit Defense Expenses such prevailing party(s) shall have paid.

Id. Pursuant to this agreement, the Insurers advanced to PTP 50% of its defense costs in the Castor Action.

On September 27, 2012, Hon. Charles Ramos of the Supreme Court of New York, County of New York granted summary judgment in favor of PTP on all claims in Castor's complaint. See Rible Decl. Ex. B. As relevant here, Justice Ramos found that Castor's damages were not caused by the "operation of the PTP system," as required to trigger PTP's indemnification obligation under the TSA. Id. at 9. He held that Castor's alleged business interruption losses were caused not by the "relatively minor oil spill" that prompted the Cayo de Agua lawsuit, but rather by the Panamanian court's Attachment of Castor's oil. Id. at 11. The Attachment, in turn, was caused by Castor's own failure to register to do business in Panama. This was because, as an unregistered business, Castor's assets were subject to attachment based on a bond of only $1000. Had Castor registered to do business, the bond required to secure an attachment would have been prohibitively expensive, and the Attachment almost certainly would not have issued. Id. at 9-10.

Castor appealed Justice Ramos's decision to the Appellate Division - First Department, which affirmed, finding that

"[Castor's] oil was attached because it was not licensed to do business in Panama." Rible Decl. Ex. C, at 2. The New York Court of Appeals denied Castor's motion for leave to appeal. Rible Decl. Ex. D.

On December 3, 2014, PTP filed this action seeking to recover the remaining 50% of its defense costs pursuant to the Defense Costs Agreement. The Insurers, for their part, contend that the Insurance Policies do not provide coverage for Castor's claims against PTP and seek to recoup the 50% of the costs associated with defending the Castor Action that they previously advanced to PTP. Both sides now move for summary judgment.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." Palmieri v. Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006) (quoting Thompson v. Gjivoje, 896 F.2d 716, 721 (2d Cir.1990)). "Insurance contracts [] must be interpreted 'according to the reasonable expectation and purpose of the ordinary businessman when making an ordinary business contract.'" Lewis & Stanzione

8

v. St. Paul Fire & Marine Ins. Co., No. 1:13-CV-863, 2015 WL 3795780, at *3 (N.D.N.Y. June 17, 2015) (quoting Gen. Motors Acceptance Corp. v. Nationwide Ins. Co., 4 N.Y.3d 451, 457 (Ct. App. 2005)).

The critical threshold question in this case is whether the Insurance Policies create a duty to defend on the part of the Insurers, or whether, instead, they create only a narrower duty to reimburse costs incurred in the defense claims for which the Insurers have a duty to indemnify.

This question is important for two reasons. First, "[t]he duty to defend is broader than the duty to indemnify." CGS Indus., Inc. v. Charter Oak Fire Ins. Co., 720 F.3d 71, 77 (2d Cir. 2013) (citation omitted). The "duty to defend arises if the claims against the insured arguably arise from a covered event, even if the claims may be meritless or not covered, either because the insured is not liable or because the event is later determined outside the policy's scope of coverage." Rhodes v. Liberty Mut. Ins. Co., 67 A.D.3d 881, 883-84 (2d Dep't 2009); see also Hugo Boss Fashions, Inc. v. Federal Ins. Co., 252 F.3d 608, 625 (2d Cir. 2001) (holding that insurer had no duty to indemnify because claim fell within policy exclusion but nonetheless had duty to defend because applicability of policy exclusion was uncertain at the outset of the litigation). In other words, the duty to defend applies to claims that are

arguably covered, whereas the duty to indemnify covers claims that are actually covered.

Second, in duty-to-defend cases, the insurer's duty to pay defense costs is determined on the basis of the underlying complaint alone. "To avoid the duty to defend, an insurer 'must demonstrate that the allegations of an underlying complaint place that pleading solely and entirely within the exclusions of the policy and that the allegations are subject to no other interpretation.'" CGS Indus., 720 F.3d at 77 (citation omitted).[1] By contrast, in reimbursement cases, so long as the policy does not specify otherwise, the court may consider the eventual resolution of the claims to determine if the they were actually (not just arguably) covered. "[U]nder policies containing a duty to reimburse defense costs but not a duty to defend, the Insurers have a duty to reimburse defense costs for claims that are established to be covered through judgment and settlement, and not for claims only potentially falling within the policy's coverage." Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp., 73

---

[1] There is a narrow exception for certain types of extrinsic evidence that "plainly take the case outside the policy coverage." Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 148 (2d Cir. 2004). However, "New York law is 'unclear' regarding the circumstances in which a court may consider extrinsic evidence in making coverage determinations." Stein v. N. Assur. Co. of Am., 495 F. App'x 108, 111 (2d Cir. 2012) (citation omitted).

10

F.3d 1178, 1219 (2d Cir. 1995) opinion modified on denial of reh'g, 85 F.3d 49 (2d Cir. 1996).[2]

The Insurers argue that the Defense Costs Agreement established the exclusive framework for either party to seek reimbursement of defense costs, thereby precluding any duty to defend. They argue that the Defense Costs Agreement states that the parties "wish to agree to a resolution of certain issues regarding defense obligations as they may affect the Civil Suits and the Castor Suit." Rible Decl. Ex. N. It further provides that, upon the conclusion of the Castor Action, either party may seek a coverage determination, and that "the prevailing party(s) in respect of such coverage determination will be reimbursed by the adverse party(s) for the portion of the Castor Suit Defense Expenses such prevailing party(s) shall have paid." Id. The

---

[2] Some courts have stated that "the same allegations that trigger a duty to defend trigger an obligation to pay defense costs." Travelers Prop. Cas. Corp. v. Winterthur Int'l, No. 02-cv-2406, 2002 WL 1391920, at *6 (S.D.N.Y. June 25, 2002). However, as the Second Circuit recognized in Stonewall, in these cases the insurer would be entitled to recoup any advances at the resolution of the case "if the facts ultimately show that the claim was not covered, regardless of the allegations contained in the underlying complaint." 73 F.3d at 1219; see also XL Specialty Ins. Co. v. Level Global Investors, L.P., 874 F. Supp. 2d 263, 282 (S.D.N.Y. 2012) (insurer may be obligated to fund criminal defense of insured, but could recoup costs if the conviction established that a policy exclusion applied); Axis Reinsurance Co. v. Bennett, No. 07-cv-10302, 2008 WL 2600034, at *2 (S.D.N.Y. June 27, 2008) (obligation to advance defense costs is "subject to recoupment in the event it is ultimately determined no coverage was afforded").

11

Insurers contend that these provisions demonstrate the parties' intent to supersede the defense costs-related provisions of the Insurance Policies. Rible Decl. Ex. N.

In so arguing, the Insurers ignore the subsequent provision of the Defense Costs Agreement, which expressly states that it "does not supersede or reform the Primary Policy or the Bumbershoot Policy, which remain totally in effect including, but not limited to, all Limits of Liability." Id. In light of this provision, the Court finds that the Defense Costs Agreement does not displace the provisions of the Insurance Policies governing payment of defense costs.

Nonetheless, the Court finds that the Insurance Policies, by their own terms, do not create a duty to defend. Where the parties to an insurance contract intend to create a duty to defend, they do so expressly by, for example, providing that the insurer "will have the right and duty to defend any 'claim' or 'suit' against an insured seeking 'damages' to which this insurance applies, even if any of the allegations of the 'claim' or 'suit' are groundless, false or fraudulent." Lewis & Stanzione, 2015 WL 3795780, at *1. "In the absence of a policy provision expressly imposing a duty to defend," however, "New York courts will not find such a duty." MBIA Inc. v. Certain Underwriters at Lloyd's, London, 33 F. Supp. 3d 344, 355 (S.D.N.Y. 2014) (alteration omitted).

The Insurance Policies at issue in this case each contain a provision related to payment of defense costs, but those provisions contain none of the standard "duty to defend" language, creating instead a narrower obligation to pay defense costs associated with covered claims. The Primary Policy provides:

> Notwithstanding the limit stated in the declarations hereto and/or anything contained herein to the contrary, Underwriters agree that they will pay in addition, <u>all costs, charges and expenses in connection with any claim hereunder</u>…

Rible Decl. Ex. A ¶ 3 (emphasis added). The Bumbershoot Policy defines the "damages" payable by the Bumbershoot Insurers to include:

> all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, or interest expenses, for doctors, lawyers, nurses and investigator and other persons and for litigation, settlement adjustment and investigation of claims and suits where same are paid <u>as a consequence of any occurrence covered hereunder</u>…

Lonero Aff. Ex. A ¶ II(H) (emphasis added). In addition, the Bumbershoot Policy expressly disclaims any duty to defend: "The Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured." Lonero Aff. Ex. A § IV(A). Accordingly, because neither Insurance Policy expressly creates a duty to defend, no such duty exists.

The Court turns next to the question of whether the Insurance Policies provide coverage for Castor's claims against PTP. The Primary Policy obligates the Primary Insurers to "pay on behalf of the Assured, any such sum or sums as they may be liable to pay as the result of an accident or occurrence in respect of or in connection with work and/or operations and/or activities and/or the business of the Assured." Rible Decl. Ex. A § 1. As to the Bumbershoot Policy, the insuring agreement provides, in relevant part, that the insurer "shall pay on behalf of the Insured … All sums which the Insured shall become legally liable to pay as damages on account of … property damage … [c]aused by or arising out of each occurrence happening anywhere in the world." Lonero Aff. Ex. A. The Bumbershoot Policy defines "property damage" as "physical loss of or direct physical damage to or destruction of tangible property." Id.

The Insurers argue that Justice Ramos's summary judgment opinion in the Castor Action established that Castor's claims against PTP did not come within the scope of the two Insurance Policies' insuring agreements.[3] As discussed above, in granting summary judgment in favor of PTP, Justice Ramos found that Castor's damages resulted solely from the Panamanian court's

---

[3] Because this case involves a duty to reimburse defense costs, not a duty to defend, the Court considers not only the Castor complaint, but also the ultimate resolution of that action. See Stonewall, 73 F.3d at 1219.

14

Attachment of Castor's oil, which, in turn, was attributable to Castor's failure to register to do business in Panama. See Rible Decl. Ex. B, at 9. The Insurers argue that this decision established that Castor's alleged losses were not "the result of an accident or occurrence in respect of or in connection with" PTP's work, operations, activities, or business within the meaning of the Primary Policy, nor were they "on account of property damage" within the meaning of the Bumbershoot Policy.

The Court agrees. PTP argued on summary judgment in the Castor Action that Castor's losses were caused solely by the Attachment, and, having prevailed, is bound by that determination. See Simon v. Safelite Glass Corp., 128 F.3d 68, 71-72 (2d Cir. 1997) ("Judicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding," on which the earlier court relied). Thus, Justice Ramos's finding established that Castor's claims against PTP arose from risks outside the scope of coverage provided by the Insurance Policies. Accordingly, PTP is not entitled to coverage for the Castor Action.

In addition, even if PTP's potential liability to Castor came within the insuring agreements, the Insurance Policies contain express exclusions applicable to Castor's claims. The Primary Policy excludes coverage for "liability arising from

15

delay, loss of market and/or consequential loss therefrom." Rible Decl. Ex. A § 2(vii). In this case, Castor did not contend that its oil had been physically damaged in any way. Instead, its damages were caused by its inability to access the oil while the Attachment was in place and the resulting interruption to its business. Thus, all of the losses that Castor sought to recover from PTP were caused by delay, and are therefore subject to the "delay" exclusion. See Blaine Richards & Co. v. Marine Indem. Ins. Co. of Am., 635 F.2d 1051, 1056 (2d Cir. 1980); Channel Fabrics, Inc. v. Hartford Fire Ins. Co., No. 11-cv-3483, 2012 WL 3283484, at *11 (S.D.N.Y. Aug. 13, 2012).[4]

Similarly, the Bumbershoot Policy expressly excludes coverage for liability "resulting from or incurred by reason of … [c]apture, seizure, arrest, taking, restraint, detainment, confiscation, preemption, requisition, or naturalization, or the consequences thereof or any attempt thereat, whether in time of

---

[4] PTP argues that the "delay" exclusion is applicable only to first-party insurance claims in which the insured seeks indemnification for losses attributable to delay in accessing its own property, and is not applicable to third-party insurance claims such as this one. However, PTP cites no case drawing this distinction. Moreover, since the Primary Policy is a third-party insurance policy, holding that the "delay" exclusion is not applicable to third-party insurance claims would render that provision meaningless. See Ins. Co. of N. Am. v. ABB Power Generation, Inc., 925 F. Supp. 1053, 1059 (S.D.N.Y. 1996) ("It is a commonplace that a court will interpret a contract to give effect to all of its provisions, and will avoid an interpretation that leaves part of the contract meaningless.").

peace or war and whether lawful or otherwise." Lonero Aff. Ex. A § III. The Attachment by the Panamanian authorities was a form of seizure or detainment by legal process, and therefore falls squarely within the "capture-seizure" exclusion. Accordingly, for this reason too, Castor's claims against PTP are not covered by the Bumbershoot Policy. See Blaine Richards, 635 F.2d at 1056.

Having determined that the Insurance Policies do not provide coverage for the claims asserted in the Castor Action, the Court finds that the Insurers are entitled to be reimbursed for the portion of PTP's defense costs that they previously advanced to PTP. This outcome follows from the plain language of the Defense Costs Agreement: "all parties further agree that the prevailing party(s) in respect of such coverage determination will be reimbursed by the adverse party(s) for the portion of the Castor Suit Defense Expenses such prevailing party(s) shall have paid." Rible Decl. Ex. N. Accordingly, the Insurers are entitled to summary judgment that PTP must reimburse them pursuant to the Defense Costs Agreement.

For the foregoing reasons, the Court hereby grants defendants' motion for summary judgment: (1) dismissing the Complaint with prejudice; and (2) declaring (a) that the Insurers had no duty to defend PTP in the Castor Action under the Insurance Policies, (b) that the Insurance Policies do not

provide coverage for the claims asserted by Castor against PTP in the Castor Action, and (c) that, pursuant to the Defense Costs Agreement, PTP is obligated to reimburse the Insurers for any and all defense fees and costs paid in respect of the Castor Action in an amount to be determined by the Court. The parties are directed to jointly call the Court within three business days of the date of this Opinion and Order to schedule further proceedings. The Clerk of the Court is directed to close documents number 26, 30, and 35 on the docket of this case.

    SO ORDERED.

Dated:    New York, NY
            July 16, 2015                JED S. RAKOFF, U.S.D.J.